**CHEMETRON CORPORATION,**
**Plaintiff,**

v.

**McLOUTH STEEL CORPORATION,**
**Defendant.**

**No. 73 C 228.**

United States District Court,
N. D. Illinois, E. D.
June 28, 1974.

248

Alan I. Becker and Joseph DuCoeur, of Kirkland & Ellis, Chicago, Ill., for plaintiff.

Hamilton Smith and John T. Schriver, III, of McDermott, Will & Emery, Chicago, Ill., for defendant.

## MEMORANDUM OF DECISION

JULIUS J. HOFFMAN, Senior District Judge.

■ This is an action for breach of contract. Although properly within this Court's jurisdiction,[1] the action, where

---

[1] In accordance with the specifications of 28 U.S.C. § 1332(a) and (c), the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between citizens of different states, the plaintiff being incorporated under the laws of Delaware and having its principal place of business in Chicago, Illinois, the defendant being incorporated under the laws of Michigan, having its principal place of business in Detroit, and having no facilities in Illinois other than a sales office that is in no way connected with the subject matter of this litigation.

appropriate, is governed by the applicable law of Michigan.[2]

Under the contract in issue, the plaintiff, Chemetron Corporation, obligated itself to purchase from the defendant, McLouth Steel Corporation, a minimum quantity of 975 tons of liquid oxygen and/or liquid nitrogen, combined (collectively, "liquid product"), each calendar month of the contract term. McLouth, on its part, obligated itself to make available for purchase by Chemetron, as requested, a guaranteed maximum quantity of 1,950 tons of liquid product each calendar month of the contract term. This arrangement provided Chemetron with an assured supply of liquid product so that it could meet its needs,[3] whatever they might be, from 975 tons to 1,950 tons per month. McLouth agreed to deliver the product ". . . on a twenty-four hour daily call basis . . . in approximately equal quantities each day except . . . Saturdays, Sundays, and holidays . . . ."[4]

The written agreement, executed on April 17, 1964, became effective for a five-year term on April 21, 1965, and, pursuant to contract proviso, was automatically renewed for an additional five-year term effective April 21, 1970.

In its suit, commenced January 26, 1973, Chemetron charged that, because of McLouth's repeated failures to meet its requests during the renewal term of the contract, it has been forced to purchase liquid product from other sources at prices considerably higher than those payable to McLouth under the agreement; that therefore it has sustained, and is continuing to sustain, substantial money damages.

At trial, certain evidence was introduced which revealed the nature of contract performance during the original term of the contract. In the early years of the original term, performance was according to contract specification: in the 27 months from May, 1965 through July, 1967, in averaging 1,348 tons per month, McLouth regularly made available and Chemetron purchased a quantity of product well in excess of the minimum monthly quantity; there was no credible evidence that McLouth's performance for this period was in any sense inadequate to meet Chemetron's needs for liquid product. In the next year, however, McLouth's performance declined: from August, 1967 through July, 1968, McLouth made available and Chemetron purchased more than the minimum monthly quantity in only six of those months, with the monthly average slipping to 856 tons; about this inadequate performance, Chemetron complained, and in response, McLouth offered assurances that its performance would improve and that its plans to change its steel manufacturing processes would not impair its ability to supply Chemetron's needs for liquid product. The possibility of immediate improvement was forestalled by a strike that began in August, but by December, after a period of recovery, McLouth's performance returned to approximately the level of the first two years of the original term: from December, 1968 through April, 1969, McLouth made available and Chemetron purchased, each and every month of this period, a quantity of product well in excess of the minimum monthly quantity, the average rising to 1,283 tons per month; once again, there was no evidence that McLouth's performance for this period was in any sense inadequate to meet Chemetron's needs for liquid product.

It was against this background, then, that the contract was renewed; the deadline for notification of intent not to renew passed on April 21, 1969.

The outcome of this case in large part depends upon the legal significance of

2. Although the written sales agreement contains no such provision, it was negotiated, executed, and had its duties performed in the State of Michigan. Michigan adopted the Uniform Commercial Code, 440 M.C.L. §§ 1101 et seq., effective January 1, 1964.

3. Chemetron's needs, vis-a-vis its contract with McLouth, were determined by the demands of customers it supplied with liquid product.

4. The language of paragraph VIII [DELIVERY] of the contract.

facts proved and not proved. The principal issues arise out of certain defenses interposed by the defendant, and the amount of damages, if any, to which the plaintiff is entitled. There is no dispute with respect to the execution of the contract, nor is there any dispute over the quantities of liquid product actually purchased during the period for which damages are sought.

## I.

*Cancellation Provision*

McLouth maintains that in order to sue for damages Chemetron had first to cancel the contract in its entirety. This contention finds support in the following language of paragraph XII of the contract:

> "[I]n the event of failure of either party to perform any provision of this Agreement, the only rights of the other party shall be to cancel the Agreement as provided in this paragraph to recover damages for breach of this Agreement."

Under the facts of this case, however, the harshness of this provision seems obvious.

From the outset of the 1964 contract, McLouth knew that Chemetron was purchasing liquid product from it for resale to Chemetron's customers. In April, 1964 McLouth gave Chemetron a letter addressed "to whom it may concern." In that letter McLouth stated that it had entered into an agreement to supply Chemetron "with a minimum of 65 tons per day" of liquid product. McLouth must have known that the letter would be used by Chemetron to solicit new sales agreements, and, in fact, a copy of the letter was given to the Jones & Laughlin Steel Corporation. Chemetron also advised McLouth that it had committed itself to supply large quantities of liquid oxygen to Jones & Laughlin. Within a few weeks of the execution of its contract with McLouth, Chemetron signed a sales contract to supply Jones & Laughlin with its liquid oxygen requirements. Relying on its guarantee of product availability from McLouth, Chemetron made other such commitments.

During the renewal term of the contract, when the quantities of liquid product supplied by McLouth fell far below Chemetron's needs for serving its Detroit customers, Chemetron endeavored to obtain substitute product from other sources. By late 1972, Chemetron could not obtain enough substitute product from these other sources, and, in the spring of 1973, was forced to institute an allocation program under which its customers received only 50 to 80 percent of their needs.

Under these circumstances it would have been commercially unfeasible for Chemetron to cancel its contract with McLouth notwithstanding McLouth's breaches, for Chemetron would obviously have been in an even worse position and less able to serve its customers if it had received no product at all from McLouth instead of the quantities, however insufficient, that McLouth made available.

While parties may agree to limit the remedies for breach of their contract,[5] the policy of the Uniform Commercial Code disfavors limitations and specifically provides for their deletion if they would act to deprive a contracting party of reasonable protection against breach. Subsection (2) of Section 2719, Uniform Commercial Code of Michigan, provides:

> "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act." 440 M.C.L. § 2719(2).

---

5. Section 2719(1) of the Uniform Commercial Code (Sales) of Michigan provides:

"Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this article . . . ." 440 M.C.L. § 2719(1).

The Official U.C.C. Comment on this section contains the following explanation:

"If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." 440 M.C.L.A. § 2719.

The cancellation provision of paragraph XII serves as a restriction upon the parties so as to prevent a multiplicity of suits, and in this regard it is a fair and reasonable limitation. But in this case there is little concern about suits for monthly breaches. The principal concern is the commercial feasibility of Chemetron's forfeiting all rights to receive product by cancelling the contract when its supply commitments to customers continue. In this sense the cancellation clause operates to deprive Chemetron of the substantial value of the bargain, as the essence of its bargain with McLouth was a guaranteed source of product availability. Moreover, if Chemetron were relegated to the exclusive remedy provision of paragraph XII, it would be forced to commit assets of $623,564 (increased cost of product + increased freight costs) and forgo profits of $247,929 (lost profits) for the period April, 1970 through December, 1973 alone, for to continue to receive

whatever product McLouth could make available to it, Chemetron could not cancel the contract until the end of the renewal term. Certainly the parties could not have intended this clause to work such a result.

For these reasons, then, the cancellation provision of paragraph XII must give way to the general remedy provisions of the Sales Article.[6]

*Sufficiency of Requests*

After setting forth the buyer's (Chemetron's) agreement to purchase from the seller (McLouth) a minimum quantity of 975 tons of liquid product per month, paragraph II of the contract provides:

"Seller hereby agrees to make available to Buyer for purchase, a guaranteed maximum quantity of one thousand nine hundred fifty (1950) tons of either liquid oxygen or nitrogen combined, as requested by Buyer, each calendar month during the term of this agreement."

McLouth contends that "the absence of evidence of specific orders by Chemetron precludes the recovery of damages."

The issue for decision is whether the acts of Chemetron in seeking liquid product constitute "requests" sufficient to have invoked McLouth's duty to make product available for purchase.

■ Testimonial evidence established that Chemetron ordered quantities of liquid product from McLouth on a daily basis. Mr. Bigelow, formerly Chemetron's plant superintendent in Detroit, described Chemetron's method of placing orders: each day, Bigelow would telephone McLouth's air separation plant and tell the appropriate McLouth employee the quantity[7] of liquid product needed by Chemetron. The shift engineers and turn-foremen of McLouth's air separation plant [Messrs. Day, Bearden, Willard, and Booth] denied that Bigelow

---

6. 440 M.C.L. § 2711(1) [Buyer's remedies for seller's failure to make deliveries].

7. Quantities were ordered in terms of "loads," a load being the capacity of one of Chemetron's trucks, approximately 20 tons.

(or any other Chemetron employee) had ever ordered any quantity of liquid product from McLouth, and further testified that, although they received a telephone call from Chemetron each morning, they did not know that the purpose of those calls was to order product. Such testimony is not credible. It is unreasonable to believe, as these witnesses seemed to testify, that these calls were made simply to satisfy an idle curiosity about the volume level of Mc-Louth's storage tanks. To believe that after having received daily telephone calls from Chemetron for eight years these several witnesses failed to conclude that Chemetron was interested in ordering liquid product would be absurd. Mr. Day broke a "solid front" of identical testimony by admitting, on cross-examination, that he knew Chemetron placed the calls to order product. To this same effect, Mr. Bearden, on direct examination, contradicted his own categorical statement that Chemetron never ordered any quantity of product when he testified that on the most recent occasion that he had received one of Chemetron's daily calls, Chemetron had specifically ordered "a load of oxygen." The testimony of Mr. Pasola, Mc-Louth's supervisor of engineering services, was likewise contradictory. He received weekly telephone calls from Chemetron, apparently after a call had been made to one of the shift engineers. After stating that Chemetron never ordered specific quantities of product, Mr. Pasola testified that the Chemetron caller "would ask for 'a load or two loads.'"

Even if each of the daily calls was not an order for a specific quantity of liquid product, given the factual context within which such calls were made, they constitute "requests" as a matter of law and were sufficient to have invoked McLouth's duty to make product available for Chemetron's purchase. Sometime in the middle of 1966, Mc-Louth unilaterally adopted a policy of refusing to release any product to Chemetron whenever the product in Mc-Louth's storage tanks was below a particular level.[8] The contract, as negotiated and executed in 1964, does not provide for such a policy, nor was any evidence introduced of a modification[9] so to provide. McLouth's adherence to this policy resulted not only in the receipt by Chemetron of quantities far below its needs, but far below what McLouth was obligated to make available as well. On many days McLouth failed to provide Chemetron with any product whatsoever, despite receiving the daily call from Chemetron made for the purpose of ordering such product. A practice developed whereby McLouth would signify its refusal to release product by telling Chemetron that its tanks were below the specified level. Thus, whenever Chemetron was told by McLouth that the tanks were below that level, Chemetron knew that McLouth would refuse to deliver any product. This being so, it would

---

8. It appears from the testimony of Mr. Mc-Guinn, former president of The National Cylinder Gas Division of Chemetron, called by defendant and examined as an adverse witness, that actually, McLouth may have re-adopted a policy which it had had in effect prior to April 21, 1965. This is immaterial; the significant fact is that, when the contract went into effect and performance began, through its own conduct of delivering product without regard to any tank level limitations, McLouth recognized that its obligations under the contract were not subject to or limited by any such unilateral policy.

9. Section 2209(3) of the Uniform Commercial Code (Sales) of Michigan provides:

"The requirements of the statute of frauds section of this article (section 2201) must be satisfied if the contract as modified is within its provisions." 440 M.C.L. § 2209 (3).

If the 1964 contract had been modified so as to make McLouth's contractual obligation to deliver up to a specified quantity of product subject to its tank level policy, the contract as modified would have been within the provisions of Section 2201 and hence would have to have been evidenced by a writing satisfying the statute of frauds requirements. There was absolutely no evidence of any such writing.

have been a futile act, obvious to McLouth, for Chemetron to have ordered a specific quantity of product. Even so, failure to order a specific quantity, under these circumstances, would not relieve McLouth of its duty to perform, for where a contract requires an act by one party in order that that party may obtain the other's performance, the duty to perform that act is absolved when the other's conduct has rendered performance of it a futile gesture. This is but a corollary of the long-established principle of contract law that where a promisee is prepared to perform, a condition to the promisor's duty is excused and the promisee may recover without it whenever it appears that the promisor is unable or unwilling to render the agreed performance. See, generally, Restatement of Contracts § 306. The case of Swift Canadian Co. v. Banet, 224 F.2d 36 (3rd Cir. 1955), illustrates this principle. In *Swift,* a buyer sought to defeat a seller's claim for damages for breach of contract on the ground that the seller had not delivered the goods to the carrier as provided in the contract. Noting that the buyer had signified that he would refuse acceptance, the court rejected the buyer's contention, stating:

"A party is not obligated to do the vain thing of performing, assuming that he is ready to perform, when the other party has given notice of refusal to accept performance." 224 F.2d at 37.

By making its daily telephone call, Chemetron evidenced its preparedness to order some quantity of product, but McLouth, on those days it advised Chemetron that its tanks were below the specified level, having unilaterally adopted and adhered to a policy of refusing to deliver any product on such days, excused Chemetron from the duty of tendering an order for a specific quantity of liquid product.[10]

Thus, in either event (whether Chemetron ordered quantities of product or McLouth signified refusal to release product), Chemetron's acts constituted "requests" sufficient to have invoked McLouth's duty to make product available for purchase.

*Waiver Provision*

McLouth contends that Chemetron has waived all claims relating to quantity, either because Chemetron failed to provide McLouth with notice in accordance with the contract terms or because Chemetron allegedly accepted inadequate quantities "without objection." In either case, McLouth's contention fails.

The "notice" requirement McLouth refers to is found in paragraph XIII of the contract, which provides:

"All claims relating to quantity, quality, or condition of the Product included in any delivery hereunder will be deemed waived by Buyer unless written notice thereof be given to the Seller within thirty days after such delivery."

This provision, however, does not apply to the claims at issue. The claims here do not relate to the quantity of the product "included in any delivery." Instead, they are based on the fact that the aggregate quantity of product delivered each month from April, 1970 onward was insufficient under the terms of the contract. In other words, nothing was defective about the quantity of any individual delivery; there simply were not enough deliveries.

The inapplicability of paragraph XIII to Chemetron's claims arises from the obvious fact that the parties contemplated numerous deliveries each month.[11]

---

10. Moreover, there is no evidence that McLouth at any time responded to Chemetron's numerous complaints by stating that Chemetron had not "requested" the specific quantities of product it needed, nor has McLouth contended that it would have supplied greater quantities had they been requested.

11. Paragraph VIII of the contract, styled "DELIVERY," provides:
"Said Products shall be delivered by Seller to Buyer . . . in approximately equal quantities each day except on Saturdays, Sundays, and holidays . . . . ."

Chemetron picked up product from McLouth in tank trucks having capacities of approximately 20 tons. Inasmuch as the parties contracted for monthly quantities ranging from a minimum of 975 tons to a maximum of 1,950 tons, it follows that they expected that up to 100 deliveries in tank truck loads would be made each month.

In order to measure the quantity delivered, Chemetron's truck was weighed in empty and weighed out full; occasionally the accuracy of McLouth's scale was verified by reweighing a full truck on another scale. Had a deficiency in the amount claimed to have been delivered been discovered, Chemetron would then have resorted to a claim under paragraph XIII [12] because such a claim would relate to the quantity of product included in a specific delivery. No such claim was ever made by Chemetron because no deficiency in any specific delivery was ever discovered.[13]

■ The notice principle incorporated in the Uniform Commercial Code further signifies the inapplicability of the paragraph XIII proviso to the claims at issue. Section 2–607(3)(a) of the Code requires that the buyer notify the seller of any breach with respect to goods delivered by the seller and accepted by the buyer. 440 M.C.L. § 2607(3)(a). On the other hand, there is no requirement that the buyer give notice where there is nondelivery.[14] The rationale for such a distinction is clear: where delivered goods are defective, the seller may need notice in order to remedy the defect, but in a case of nondelivery, the seller as well as the buyer knows of the breach and needs no further notice. See Jay V. Zimmerman Company v. General Mills, Inc., 327 F.Supp. 1198, 1204 (E.D.Mo. 1971). Thus, paragraph XIII simply prescribes the manner in which notice is to be given in circumstances where Section 2–607(3)(a) applies, as where product included in a delivery is defective. Just as the Uniform Commercial Code does not require notice for nondelivery, neither does paragraph XIII require notice of McLouth's breach, the nondelivery of tons of liquid product it was obligated to deliver.

McLouth also argues waiver on the ground that Chemetron accepted inadequate quantities of product "without objection." The record is clear, however, that Chemetron repeatedly objected to McLouth (at meetings, in letters, and during telephone conversations) about McLouth's inadequate performance. In terms of timeliness and content, these objections satisfy any requirements of notice, if indeed notice for nondelivery is required.

■ The time for notice is "a reasonable time," determined by applying commercial standards. 440 M.C.L.A. § 2607, Official U.C.C. Comment 4. During the 33-month period from April, 1970 to the date of filing the Complaint, Chemetron objected to McLouth on approximately ten occasions. There is no commercial standard that requires a buyer to give a seller monthly notice of the seller's failure to supply sufficient quantities of goods under a contract. Rather, given the repetitive nature of McLouth's breaches and its actual knowledge throughout the period that it was not meeting Chemetron's needs for liquid product (knowledge based on Chemetron's previous complaints), Chemetron's objections were of suffi-

---

12. Mr. Johnson (initially McLouth's Chief Engineer, later, its Executive Vice President, Operations), McLouth's witness, testified as to how a complaint concerning product delivered by McLouth could be traced to a specific delivery, i. e., truckload.

13. Johnson, however, recalled that on one occasion, there was a deficiency "in a delivery"; it therefore appears that if indeed Chemetron knew of that defective delivery, it chose to waive the claim.

14. As stated by Professor Nordstrom:
"When the seller has repudiated or failed to make a delivery, the buyer may proceed directly to a remedy. No rejection or notice is needed, most probably because the seller in these cases reasonably should know that he has not performed." Nordstrom, Law of Sales (1970) at 425.

cient frequency to be reasonably timely, and, to this extent, they satisfy the notice requirement.

> "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." 440 M.C.L.A. § 2607, Official U.C.C. Comment 4.

Here, Chemetron advised McLouth that McLouth was not supplying sufficient quantities to meet Chemetron's needs for product, that McLouth was not living up to its contractual obligations, and that Chemetron was incurring substantial losses as a result of having to obtain substitute product at greater expense. Such content was sufficient to inform McLouth that its performance remained "troublesome" and that Chemetron considered such performance to be a "breach" of McLouth's contractual duties. As no particular words must be used to constitute an adequate form of notice, Overland Bond & Investment Corp. v. Howard, 9 Ill.App.3d 348, 358–359, 292 N.E.2d 168 (1st Dist. 1972), the content of these objections, like their timeliness, satisfies the notice requirement.

Despite the lengthy series of objections from Chemetron, prior to filing its answer in this action, McLouth never pointed to the absence of the form of notice referred to in paragraph XIII of the contract, nor indicated any reliance on that provision. Instead, until mid-1972, McLouth provided reassurances, promising to improve its performance under the contract. These reassurances and the failure ever to mention paragraph XIII show either that McLouth never considered paragraph XIII to apply to the situation at hand, or, if McLouth did consider it applicable, its conduct conveyed its lack of concern about notice according to the terms of that paragraph. The first possibility supports the conclusion that paragraph XIII should not be construed as being applicable to claims for nondeliveries; the alternate possibility presents a classic situation in which McLouth should be estopped from raising such a defense.

In the latter situation, some courts utilize the concept of waiver. For example, in United States Hoffman Machinery Corp. v. Carlson, 253 Iowa 304, 111 N.W.2d 271 (1961), the buyer, "by letter and telephone, repeatedly complained to agents and employees" of the seller, over a period of fifteen months, that the goods supplied were defective. The seller assured the buyer that it would take care of the matter "satisfactorily," and attempted to remedy the defect, but failed. Subsequently the seller attempted to defeat the buyer's claim for breach of warranty by relying on a contractual notice provision. In these circumstances, the court rejected the defense, stating:

> "[The buyer] did not give notice of defects by registered mail within ninety days after delivery as required by the contract, but this failure is unimportant. [The seller] knew of the complaints, promised help and attempted repairs up to June 1955. [The seller's] actions waived the formality of notice required by the contract." 111 N.W.2d at 272.

In any event, McLouth may not now assert Chemetron's lack of formal compliance with paragraph XIII in order to bar the claims at issue.

*Force Majeure Provision, and Impossibility and Presupposed Condition Defenses*

In material part, paragraph XI of the contract provides:

"The failure of either Seller or Buyer to perform any of its obligations hereunder, if caused by an . . . explosion . . . or by any other circumstances beyond the reasonable control of the party so failing, shall not subject such party to any liability to the other party . . . ."

■ The evidence showed that there were certain explosions in McLouth's 30-ton compressor; there were no such explosions in its 16-ton compressor. Apart from the fact that there was not an adequate showing that the explosions were beyond McLouth's control,[15] the defense of *force majeure* is subject to equitable principles and thus would not serve to perpetually release McLouth from its contractual obligations. See *Pacific Trading Co. v. Mouton Rice Milling Co.*, 184 F.2d 141, 148 (8th Cir. 1950). On the contrary, McLouth would be required to employ alternative means to fulfill its obligations, such as by replacing the 30-ton compressor with safe, productive equipment. See Anderson, Uniform Commercial Code § 2–615:17 (1971) at 308. Even if unavoidable and irremediable, the explosions in no way affected McLouth's ability to produce 16 tons of liquid product per day from the 16-ton compressor and 50 tons of liquid product per day from the #4 cold box, and therefore cannot serve as a defense to McLouth's failure to supply Chemetron with those quantities. See 6 Corbin on Contracts § 1342.[16]

■ Nor was McLouth's failure to make sufficient product available to Chemetron caused by "circumstances beyond [its] reasonable control." At the time the contract went into effect McLouth had equipment capable of producing 702 tons of gaseous oxygen and 96 tons of liquid product per day, quantities sufficient to meet its contractual obligations. In 1967, however, McLouth removed from production two liquid oxygen compressors, reducing its productivity by at least 40 tons of liquid product per day. McLouth did not replace those compressors or otherwise restore production capacity. In August, 1968 McLouth took its #3 cold box (capacity, 180 tons of oxygen per day) out of operation for repairs. Although the repairs were completed in November, 1968, McLouth did not restore the unit to service until February, 1971. In the interim, McLouth from time to time reduced the production of liquid oxygen from its #4 cold box in order to increase the production of gaseous oxygen for its steel mill; this would not have been necessary but for its decision to keep the operational #3 cold box on "standby." In 1969 McLouth changed its method of processing steel, implementing new methods of oxygen usage which greatly increased the quantity of oxygen wasted through "venting." To supply its steel mill with greater quantities of gaseous oxygen, it reduced the quantity of liquid oxygen produced in the #4 cold box and converted additional quantities of liquid oxygen to gas. In view of these facts, McLouth will not be heard to claim that its alleged inability to make sufficient product available to Chemetron was caused by "circumstances beyond [its] reasonable control."

McLouth has also raised the defense of impossibility of performance. The

---

15. There was insufficient evidence to the effect that McLouth employed available means to avoid explosions, such as by using improved lubricants or by modifying its ring design, both of which Chemetron had successfully done under similar circumstances.

16. "Assuming that he can show that the contingency is one that is within the terms of the contract provision and therefore excuses from performance, he remains bound by his distribution contracts insofar as supply is available and performance remains practicable." 6 Corbin on Contracts at 410.

parties' contract, however, is plainly a contract for the sale of goods within Article 2 of the Uniform Commercial Code, and promulgation of the specific defense of impracticability, Section 2–615(a),[17] suggests that the common law defense of impossibility has been displaced with respect to such contracts.[18]

Under the facts of this case (previously discussed in their relation to the *force majeure* defense, *supra*), the defense of impracticability cannot lie. A party may not, by its own conduct, create the event causing the impracticability of performance, Martin v. Star Publishing Co., Del., 11 Terry 181, 126 A.2d 238, 242–243 (1956), 6 Corbin on Contracts § 1329 at 346; in fact, it must make all reasonable efforts to avoid the "impossibility," Pennsylvania State Shopping Plazas, Inc. v. Olive, 202 Va. 862, 120 S.E.2d 372, 375–376 (1961), 6 Corbin on Contracts § 1329; and, once the event occurs, it must employ any practicable alternative means of fulfilling the contract, even if it had originally expected to meet its obligations in a particular way, Transatlantic Financing Corp. v. United States, 124 U.S.App.D.C. 183, 363 F.2d 312, 317 (1966). Finally, as provided in Section 2–615(b) [19] of the Uniform Commercial Code, the seller must allocate its production among its customers in any manner which is fair

and reasonable. Here, McLouth had two "customers" for its production: Chemetron, under the written contract, and McLouth's own steel mill. Although McLouth purports to rely on the statutory defense, it presented no evidence that it made any attempt to allocate product, between the two, in a "fair and reasonable" manner. From April, 1970 through December, 1973, McLouth supplied Chemetron with only one-third of Chemetron's liquid product needs, while there was no evidence that McLouth supplied its steel mill with anything less than 100 percent of its requirements.[20] In no sense could this allocation be considered fair and reasonable.

"Failure of a presupposed condition," raised by McLouth as an affirmative defense, is likewise known as the defense of impracticability. McLouth claims that the parties "understood and agreed" that McLouth would only sell its "excess" product to Chemetron. However, no such provision is included in the contract, and the concept is inconsistent with McLouth's express guarantee to Chemetron of the availability of 1,950 tons per month, with only product beyond the first 1,950 tons subject to being "in excess" of McLouth's own needs.[21] Thus, such an "agreement" would be inconsistent with the express terms of the written contract, and

---

17. Section 2615(a) of the Uniform Commercial Code (Sales) of Michigan provides:
"Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid." 440 M.C.L. § 2615(a).

18. See 440 M.C.L.A. § 2615, Official U.C.C. Comment 3, and, in conjunction therewith, 440 M.C.L.A. § 1103.

19. "Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate

production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable." 440 M.C.L. § 2615(b).

20. The burden was on McLouth to prove the fairness of the allocation. 6 Corbin on Contracts § 1342 at 413.

21. The third provision of paragraph II of the contract states:
"Seller further agrees to sell to Buyer any quantities of said liquid products produced in excess of one thousand nine hundred fifty (1950) tons each month which quantities are not required for consumption by Seller in its own operations on an 'as available—as required' basis at the price schedule specified herein."

therefore evidence of such an agreement may not be considered. 440 M.C.L. § 2202.

*Damages*

■ A divisible contract is, for example, one that is composed of independent monthly parts, the performance of any one of which will bind the other party *pro tanto*. Integrity Flooring v. Zandon Corporation, 130 N.J.L. 244, 32 A.2d 507, 509 (1943).

■ The effect of a breach of contract depends in large part upon whether the contract is to be regarded as indivisible or divisible. Thus, although this action was filed in January of 1973, as the contract is divisible, it would be arbitrary to disallow recovery of damages accrued beyond that month where there is adequate evidence to support the damage claims, the damages are certain of computation, and the breaches do not differ in any significant respect from those that preceded January, 1973. However, where the evidence of future damages, accrued (from January, 1974 through trial) and not accrued (from trial through March, 1975), consists solely of a speculative projection, it would be equally as arbitrary to award damages, particularly where such damages could be established, with certainty, in the near future.

■ Under the Uniform Commercial Code, the buyer's damages for nondelivery of goods consist of the sum of contract-cover or contract-market differential, incidental damages (expenses reasonably incurred), and consequential damages (any loss resulting from general or particular requirements and needs of which the seller had reason to know at the time of contracting and which could not be prevented by buying substitute goods or otherwise), less the expenses saved as a result of the seller's breach.[22]

From time to time during the period for which damages are sought, Chemetron advised McLouth that it was incurring substantial damages as a result of McLouth's failure to supply it with sufficient quantities of liquid product; that the damages consisted of the higher cost of obtaining product from other sources and shipping that substitute product to Detroit. Chemetron proved the specific amount of these damages based on its cost records which included, the price of the product purchased from other sources, the recognized value of product obtained in trade, and the cost of shipping the product by common carrier. With respect to liquid product obtained from Chemetron's own plants or shipped in Chemetron's own trucks, the cost was based on Chemetron's standard production cost for the plant from which the product was obtained and the standard mileage and wage rates for shipping, using standards calculated annually by Chemetron in the regular course of its business. Against this, Chemetron set off the price it would have paid McLouth for the product under the terms of the contract plus the cost for shipping from McLouth's plant in Trenton, Michigan had McLouth supplied the product. 440 M.C.L. § 2712(2).

■ Beginning no later than November, 1972, Chemetron could have sold the maximum 1,950 tons of liquid product guaranteed by McLouth.[23] However, Chemetron was unable to obtain a total of 1,950 tons from all sources, including McLouth. As a result, Chemetron lost sales it could have transacted, and had not only to reject customer orders for additional quantities, but, beginning in April, 1973, had to allocate product on the basis of 50 to 80 percent of its customers' needs. Chemetron is entitled to recover damages for the profits it lost, because McLouth, having known at the time the contract was executed that Chemetron would be purchasing liq-

---

22. 440 M.C.L.A. §§ 2712, 2713 and 2715.

23. The damage calculations for the period April, 1970 through October, 1972 rely solely on Chemetron's actual product needs for the Detroit area, based on the total quantity received by Chemetron from all sources in that area.

uid product from McLouth for the purpose of resale, did not supply such product in sufficient quantities. 440 M.C.L.A. § 2715, Official U.C.C. Comment 6. These lost profits were properly calculated on the basis of the average selling price in Detroit less both the price Chemetron would have paid McLouth and a prorata share of Chemetron's distribution costs.[24] Swiss-American Importing Co. v. Variety Food Products Co., 471 S.W. 2d 688 (Mo.Ct.App.1971).

 McLouth presented no evidence to refute any of the evidence of damages Chemetron incurred from April, 1970 through December, 1973. Instead, it argued that Chemetron's business records, rather than the summaries prepared from them, should have been introduced as the evidence of such damages. McLouth did not deny that all of the underlying records had been made available to it during discovery, and again during the course of the trial. In such circumstances, the use of summaries is completely adequate and proper. Youngs Drug Products Corp. v. Dean Rubber Mfg. Co., 362 F.2d 129, 134 (7th Cir. 1966); Peter Kiewit Sons' Co. v. Summit Const. Co., 422 F.2d 242, 267 (8th Cir. 1969); Fairchild Stratos Corp. v. Lear Siegler, Inc., 337 F.2d 785, 794 (4th Cir. 1964); Regents of Univ. of Colorado v. K.D.I. Precision Products, Inc., 488 F.2d 261, 268 (10th Cir. 1973).

 As evidence of damages for the period January, 1974 through March, 1975, Chemetron offered a projection based on data from the months January through December, 1973. This projection has as its key assumption the notion that the conditions which existed during the first eleven months of 1973 will, on the average, exist during the fifteen-month period beginning January, 1974. Specifically, Chemetron has assumed that on the average, in the future fifteen months as in the past eleven months, McLouth will continue to supply the same quantities, Chemetron will continue to need the same quantities, McLouth will continue to need the same quantities, liquid product prices will remain the same, freight costs will remain the same, and Chemetron will continue to obtain substitute product from the same sources. There is simply no record support for these assumptions, and thus the projection would not be a "just and reasonable" basis upon which to award such damages, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946), particularly where such damages could be established, with certainty, in the near future.

## II.

Accordingly, for breaches of contract from April, 1970 through December, 1973, Chemetron is entitled to recover from McLouth damages in the following amounts: cost differential damages of $387,314 for increased cost of product; incidental damages of $236,250 for increased freight costs; and consequential damages of $247,929 for lost profits.

The foregoing memorandum of decision is intended to satisfy the requirements of Rule 52(a) of the Federal Rules of Civil Procedure.

24. This calculation is conservative. For instance, McLouth is charged with lost sales for the difference between 1,950 tons and the quantity Chemetron obtained from all sources. If, for example, Chemetron had sold 2,500 tons, obtained 500 from McLouth and 550 from other sources, it would be reasonable to charge McLouth with a deficiency of 1,450 tons, not merely 900 tons, because the former figure would more precisely put Chemetron in the position it would have been had McLouth fulfilled its contractual obligations. Matsushita Electric Corp. v. Sonus Corp., 284 N.E.2d 880, 890 (Mass.1972). In addition, setting off a prorata share of all Detroit distribution costs, fixed as well as variable, favors McLouth, as Chemetron received no "savings," in its fixed costs, from McLouth's failure to deliver. Finally, no damages are sought for the loss of the Jones & Laughlin contract, which loss was occasioned by McLouth's failure to supply the quantities of product it had guaranteed in the contract.