STATE OF MAINE                          SUPERIOR COURT
LINCOLN, ss.                            CIVIL ACTION
                                        DOCKET NO. AP-21-01

55 OAK STREET                    )
         Appellant,              )
                                 )
                                 )
    v.                           )
                                 )      **ORDER ON FED APPEAL**
RDR ENTERPRISES, INC             )
         Appellee                )
                                 )

## INTRODUCTION

The matter before the court is Appellant 55 Oak Street, LLC's appeal of the Wiscasset District Court's order on an action for forcible entry and detainer. For the following reasons, this court AFFIRMS the District Court's judgment on most points and invites further briefing.

## BACKGROUND

This matter was heard on November 18, 2020. The District Court (Wiscasset, *Martin, J.*) heard testimony from the owner of the property through 55 Oak Street, LLC, Max Ross, and the president and owner of RDR Enterprises, Richard Reid. (R. 7, 16.)

The District Court found the following facts, which are supported by evidence in the record: Appellant 55 Oak Street, LLC (hereinafter "Oak Street") and appellee RDR Enterprises, Inc. (hereinafter "RDR") entered into a commercial lease on April 1, 2017. *55 Oak Street, LLC v. RDR Enterprises, Inc.*, No. SA-20-043, at *1 (Me. Dist. Ct., Wiscasset, Dec. 15, 2020). The lease granted RDR possession of a property known as the "Thistle Inn," located at 55 Oak Street, Boothbay Harbor, Maine. *Id.* The Thistle Inn is a bed and breakfast with 6 guest rooms and a restaurant with 4 separate dining rooms capable of seating up to 99 patrons, with outdoor seating capable of seating 45 more. *Id.* The terms of the lease included an initial term of five years, due to expire on March 31, 2022. *Id.*

1

RDR closed for business on March 18, 2020, due to the COVID-19 pandemic and Governor Janet Mills's Executive Order issued on the same day. *Id* at 3. The Executive Order mandated, among other things:

> All restaurants and bars shall close their dine-in facilities. Such businesses that offer carry-out, delivery, and drive-through food and beverage service may continue to do so but eating and drinking inside restaurants and bars is temporarily prohibited.

Me. Exec. Order No. 14 FY 19/20 (Mar. 18, 2020). RDR was current on its rent obligations until April 1, 2020. *55 Oak Street*, at *5 (Dec. 15, 2020). RDR made partial payment in April and ceased payment entirely afterwards, except for one payment made in July. *Id.* at *2 n.3.

On April 29, 2020, the Governor announced the *Together We Are Maine: Restarting Maine's Economy Plan* (Restarting Plan). This plan introduced a deliberative process to slowly ease prior restrictions on businesses and individual activities in phases, starting on May 1, 2020. *See* Me. Exec. Order No. 49 FY 19/20 (Apr. 29, 2020). According to the Restarting Plan, restaurants like RDR's were able to open for indoor dining with reservations, capacity limits and other safety measures starting on June 1, 2020. *55 Oak Street*, at *5 (Dec. 15, 2020). Under this plan, the court found that RDR could have reopened indoor dining at 40% capacity. *Id.* at 6.

RDR declined to reopen subject to the restrictions of the Restarting Plan. After several notices of default and subsequent negotiations, Oak Street filed an action for Forcible Entry and Detainer in the Wiscasset District Court on October 14, 2020. RDR defended on the basis that their obligation to pay rent was excused by the Force Majeure clause in the lease agreement, which reads:

> **FORCE MAJEURE.** Neither party hereto will be liable for any failure to comply or delay in complying with its obligations hereunder if such failure or delay is, including but not limited not to, due to acts of God, inability to obtain labor, strikes, lockouts, lack of materials, governmental restrictions,

2

enemy actions, civil commotion, fire, unavoidable casualty or other similar causes beyond such party's reasonable control (all of which events are herein referred to as "Force Majeure Events"). It is expressly agreed that neither party will be obliged to settle any strike to avoid a Force Majeure Event from continuing.

(A. 19.) The court found that the Governor's initial order prohibiting indoor dining was a governmental restriction within the definition of a Force Majeure Event in the lease and excused RDR's from paying rent for the months of April and May. *55 Oak Street*, at *5 (Dec. 15, 2020). The court found that COVID-19 pandemic itself was a Force Majeure Event, but that after RDR had the duty to mitigate the effect of the pandemic after they were allowed to reopen on June 1, 2020. *Id.* at 6. The court found that because RDR was limited to 40% seating capacity by pandemic restrictions, it had the ability to pay 40% of the disputed rent for the months of June, August, September, October and November.[1]

*Id.* at 6-7. The court concluded by denying the complaint for forcible entry and detainer on the grounds that RDR had not breached the terms of its lease because its obligations to pay rent were either completely or partially excused for all of the relevant months. *Id.* at 7.

Oak Street filed this appeal with the Superior Court on January 4, 2021. Oak Street raises three issues on appeal. First, Oak Street challenges the District Court's denial of a writ of possession, arguing that the court finding that RDR owed any amount in rent compelled it to grant the writ. Second, Oak Street challenges the District Court's ruling that RDR was partially excused from paying rent after it was allowed to reopen on the basis of multiple findings they allege were clear error unsupported by evidence. Finally,

---

[1] The court did not include July in its analysis because RDR made a rent payment in July. *55 Oak Street*, at *7 (Dec. 15, 2020).

Oak Street argues that the District Court's order exceeded its jurisdiction by declaring the prospective rights of the parties.

## STANDARD OF REVIEW

Either party aggrieved by a District Court's judgment on a forcible entry and detainer action may appeal to the Superior Court on questions of law. *See* 14 M.R.S. § 6008 (2020); 14 M.R.S. § 6017 (2020); *see also* M.R. Civ. P. 80D(f)(1).

The trial court's rulings on issues of law are reviewable de novo, and the trial court's findings of fact may only be set aside if they are clearly erroneous. *See* M.R. Civ. P. 76D. A factual finding is clearly erroneous if (1) there is no competent evidence in the record to support it, (2) if the fact-finder clearly misapprehended the meaning of the evidence, or (3) if the force and effect of the evidence taken as a whole rationally persuades the appellate court "to a certainty" that the finding is "so against the great preponderance of the believable evidence that it does not represent the truth and right of the case." *Wells v. Powers*, 2005 ME 62, ¶ 2, 873 A.2d 361.

An appellate court will not substitute its judgment as to the weight or credibility of the evidence if there is evidentiary support in the record for the trial court's findings. *State v. Connor*, 2009 ME 91, ¶ 9, 977 A.2d 1003.

## DISCUSSION

### I.    Partial Excuse

One issue Oak Street raises on appeal is whether the District Court erred when it found that the *force majeure* clause partially excused performance for the months of June, August, September, October and November. Oak Street challenges two of the District Court's factual findings. First, Oak Street argues that the District Court's finding that RDR failed to pay rent due to the pandemic was clear error unsupported by evidence.

4

Second, Oak Street argues that the district court's finding that RDR's ability to pay was limited to 40% during the months at issue was clear error unsupported by evidence.

Oak Street argues that the District Court never made any explicit finding that RDR's nonpayment of rent during the months at issue was due to the pandemic. This is untrue. The District Court found that "the pandemic itself constitutes a *force majeure* event" and later states that this *force majeure* event caused RDR to be able to generate only 40% of its usual revenue.[2] *55 Oak Street*, at *6 (Dec. 15, 2020). This finding is supported by testimony and documentary evidence produced at the hearing. (R. 20-24; A. 77-78.)

Oak Street argues that this finding does not mean that RDR's failure to pay rent was "due to" the pandemic. Oak Street contends that their failure to pay was actually a business decision because RDR chose to stay closed and had other funds it could have paid with. Whether this is true or not is irrelevant; an appellate court will not substitute its judgment for the judgment of the trial court where there is evidence in the record to support the trial court's findings. *State v. Connor*, 2009 ME 91, ¶ 9, 977 A.2d 1003. The District Court found that the pandemic caused RDR to be limited to 40% of its usual revenue and there is evidence in the record to support this conclusion. The court will not disturb this finding. *See* M.R. Civ. P. 76D.

Oak Street's challenge to the District Court's use of the 40% figure is similarly flawed. Oak Street argues that the reduction in seating capacity was an insufficient basis

---

[2] Oak Street briefly insinuates that the pandemic might not be a *force majeure* event within the meaning of the contract because the District Court went outside the four corners of the agreement when it said that it was "compelled to take a broader interpretation of the parties' *force majeure* provision" in light of Maine law. *See 55 Oak Street*, at *6 (Dec. 15, 2020). Whether or not it was proper for the court to do this, it is obvious that a pandemic disease and the accompanying public health measures are things beyond either party's reasonable control and as such are *force majeure* events to the extent they interfere with performance. The pandemic qualifies as a *force majeure* event based on the plain meaning of the lease language.

5

on which to make a finding that RDR's revenues would have been reduced to 40% had they chosen to reopen. To be sure, with more evidence the District Court would likely have been able to arrive at a more precise number. However, the court reasoned that with capacity limited to 40%, RDR would only be able to seat 40% of its usual customers, and therefore would only receive 40% of its normal revenues. This is a rational conclusion supported by competent evidence in the record, so the court will not disturb it. *See* M.R. Civ. P. 76D.

## II. Effect of Rents Owed on Right of Possession

The next issue on appeal is whether the trial court erred as a matter of law when it ruled against Oak Street on the issue of possession, even though it held RDR owed amounts in rent. Oak Street argues that this constitutes a default under the terms of the lease and triggers a right to terminate the lease and immediately recover possession.

As a preliminary matter, RDR argues that this issue was not raised in front of the District Court and is therefore waived on appeal. *Foster v. Oral Surgery Assocs., P.A.*, 2008 ME 21, ¶ 22, 940 A.2d 1102 ("An issue raised for the first time on appeal is not properly preserved for appellate review.") RDR is correct that the effect of the *force majeure* clause on the parties' right of possession was not argued during the hearing. Oak Street argues that this issue was not waived because it is actually a jurisdictional issue and jurisdictional issues cannot be waived. *See 20 Thames St. LLC v. Ocean State Job Lot of Maine 2017, LLC*, 2020 ME 55, ¶ 5, 231 A.3d 426. According to Oak Street, the District Court exceeded its jurisdiction by applying equitable principles to the plain language of the contract to find that a partial nonpayment of rent did not constitute a default in this context.

Oak Street's jurisdictional argument is based on a plain misreading of the District Court's judgment. The court wrote:

6

> Because the parties are subject to the *force majeure* clause, and the Court finds that RDR has not breached the terms of the lease as its obligations to pay base and additional rent are either entirely excused, or partially excused, consistent with this Judgment, Oak Street's complaint for forcible entry and detainer is hereby **DENIED**.

*55 Oak Street*, at *7 (Dec. 15, 2020). This ruling is clear; the court held that RDR was excused from performance by the *force majeure* clause within the lease agreement and that even a partial excuse meant that RDR had not breached the lease terms. The District Court never appealed to equitable principles to reach this conclusion.[3]

To the extent that Oak Street's argument is not jurisdictional, however, it was not waived. An action for forcible entry and detainer on a commercial lease is a summary proceeding strictly limited by statute to the question of which party is entitled to immediate possession of land and the amount of rent owed, if any. *Tozier v. Tozier*, 437 A.2d 645, 647 (Me. 1981); 14 M.R.S. § 6017(2)(A). The District Court is required to decide both issues when the amount of rent owed is disputed. *Id.* In this case, the only issue the District Court was presented with and analyzed was the effect of the *force majeure* clause on the rent owed. Because the District Court was also compelled to decide which party was entitled to possession of the land, the effect of the *force majeure* clause on that

---

[3] Even if the District Court had invoked equitable principles, it would not exceed its jurisdiction on an action for forcible entry and detainer. The citation Oak Street provides for this claim, *Rubin v. Josephson*, 478 A.2d 665, 669 n.5 (Me. 1984), is concerned with an unrelated issue. Footnote 5 in *Rubin* simply explains that Maine common law does not follow the *Restatement (Second) of Property*'s rule, which automatically creates a right of termination for a landlord upon a tenant's failure to pay rent, absent an agreement to the contrary. *Id.* The court explained that in light of the extensive legislation on the relationship between landlord and tenant in Maine, it deferred to the legislature's choice not to adopt this rule, and would continue to use the common law rule requiring express language stating that nonpayment of rent triggers a landlord's right to terminate the lease. *Id.* At no point does the court state, or even suggest, that equitable principles are beyond the court's jurisdiction on an action for forcible entry and detainer. To the extent that equitable principles are relevant to the determination of the immediate right of possession and the amount of rent, the District Court may consider them, even though it did not choose to do so here. *See Tozier v. Tozier*, 437 A.2d 645, 647 (Me. 1981); 14 M.R.S. § 6017(2)(A).

7

possession must also have been before it. Therefore, this court may review whether a partial excuse pursuant to the *force majeure* clause would constitute a default.

The contract states that any "Event of Default" gives the landlord a right to terminate the lease. (A. 16.) An Event of Default is defined, in the relevant part, as follows:

(a)     The failure of [RDR] to pay Base Rent, Additional Rent, or any other charges payable by [RDR] to [Oak Street] under this Lease when the same are due and such failure shall continue for ten (10) business days after the same are due . . .

*Id.* Where a contract is unambiguous its interpretation is a matter of law and the court interprets it according to plain meaning of the language used. *Camden Nat'l Bank v. S.S. Navigation Co.*, 2010 ME 29, ¶ 16, 991 A.2d 800. A contract is ambiguous if it is reasonably susceptible to different interpretations. *Id.* This provision, read alone, unambiguously states that a failure to pay any amounts owed under the lease triggers an Event of Default and gives Oak Street the right to terminate the lease.

The question that remains is the effect of the *force majeure* clause on this provision. The court must interpret a contract "to give force and effect to all of its provisions, and [] will avoid an interpretation that renders meaningless any particular provision in the contract." *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.*, 2005 ME 93, ¶ 10, 878 A.2d 504. The *force majeure* clause states that neither party will be "liable" for failure or delay in performance due to a *force majeure* event. (A. 19.) The term "liable" is not defined in the lease. However, it is clear that the purpose of the clause is to excuse the parties from performance in the event that performance is impossible due to some cause beyond either party's reasonable control. Therefore, the District Court correctly concluded, and Oak Street does not contest, that where the *force majeure* clause excused performance completely no Event of Default has occurred. If payment itself was excused, it would be

8

irrational to interpret the contact to mean that the failure to pay still triggered Oak Street's right to terminate the lease.

Oak Street's contends that its right to terminate the lease triggered after RDR was able to reopen at 40% capacity and failed to pay rent. It argues that this conclusion is compelled by the District Court finding that RDR owed any amount in back rent. The District Court seems to have arrived at its result by determining that the pandemic constituted a *force majeure* event within the meaning of the lease agreement, then applied the general principle that parties seeking to rely on a *force majeure* provision must mitigate the effects of that *force majeure* event in order to conclude that RDR was only partially excused from its rent obligations. *55 Oak Street*, at *6 (Dec. 15, 2020). This is a sound legal conclusion. However, the question remains what effect a failure to mitigate the effects of a *force majeure* event would have on the *force majeure* clause's protection from default and termination of the lease.

The District Court made no explicit findings on this issue. There is no evidence in the record that could support a finding either way because the right of termination was never discussed at the hearing. The parties have not briefed this precise issue either. The court is reticent to make what is sure to be an important ruling without full briefing on the issue. Therefore, the court invites the parties to submit supplementary briefs on the following questions:

1.) what effect, if any, does the failure to mitigate a *force majeure* event have on the *force majeure* clause's protection from default for failure to pay rent under this lease agreement?

2.) does the resolution of this question involve an ambiguity in the contract requiring the presentation of extrinsic evidence and further findings of fact?

9

### III. Prospective Rights

Oak Street argues that the District Court improperly defined the parties' rights in relation to the lease agreement prospectively, when that was outside its jurisdiction on an action for forcible entry and detainer. This is apparently based on RDR paying only 40% of the rent for the months after the District Court's judgment issued. (*See* Reply Br. at 5-6.) The court made no ruling on the parties' prospective rights. This claim is without merit.

### CONCLUSION

The District Court is hereby AFFIRMED on all points except the ruling that the *force majeure* clause precluded a default and termination of the lease for the months of June, August, September, October and November. The court requests additional briefs from the parties on the following questions:

1.) what effect, if any, does the failure to mitigate a *force majeure* event have on the *force majeure* clause's protection from default for failure to pay rent under this lease agreement?

2.) does the resolution of this question involve an ambiguity in the contract requiring the presentation of extrinsic evidence and further findings of fact?

Appellant 55 Oak Street, LLC shall submit its brief addressing these questions within 21 days of this order. Appellee RDR Enterprises, Inc. shall file its brief within 21 days from the date of service of appellant's brief. Appellant shall file any reply brief addressing issues newly raised in appellee's brief 14 days after service of the same on appellant.

The Clerk is directed to enter this order into the docket by reference pursuant to M.R. Civ.P. 79(a).

DATED: May 28, 2021

Daniel I. Billings, Justice
Maine Superior Court

10

STATE OF MAINE
LINCOLN, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-21-01

55 OAK STREET
     Appellant,

  v.

RDR ENTERPRISES, INC
     Appellee

)
)
)
)
)
)
)
)
)

**SUPPLEMENTAL ORDER**

On May 28, 2021, this court issued an order affirming the District Court (Wisscasset, *Martin*, J.) on all aspects of its ruling on the matter presently on appeal except one: whether the *force majeure* clause in the commercial lease between Plaintiff 55 Oak Street ("Oak Street") and Defendant RDR Enterprises, Inc. ("RDR") precludes a finding of default for the months of June, August, September, October and November. Specifically, the court found that there was no record on which to decide whether a failure to mitigate the effects of a *force majeure* event would abrogate the *force majeure* clause's protection from default and termination of the lease. The court invited supplemental briefing from the parties on two questions:

1.) what effect, if any, does the failure to mitigate a *force majeure* event have on the *force majeure* clause's protection from default for failure to pay rent under this lease agreement?; and

2.) does the resolution of this question involve an ambiguity in the contract requiring the presentation of extrinsic evidence and further findings of fact?

The parties have submitted their supplemental briefs and the court is now prepared to rule on these questions and enter its final judgment.

1

Oak Street argues that the *force majeure* clause requires RDR to mitigate damages to excuse its nonperformance.[1] In other words, Oak Street argues that unless RDR demonstrates that it has mitigated damages from the *force majeure* event, in this case by opening at 40% capacity, the *force majeure* clause provides no protection from default. Oak Street cites two cases in support of its reading of the contract: *Gulf Oil Corp. v. F.E.R.C.*, 706 F.2d 444 (3d Cir. 1983) and *Chemetron Corp. v. McLouth Steel Corp.*, 381 F. Supp. 245 (N.D. Ill. 1974). Both cases state that a party wishing to use a *force majeure* clause to excuse its nonperformance must show that it has taken steps to avoid the event's occurrence or minimize its effects on the party's performance. *Gulf Oil*, 706 F.2d at 454; *Chemetron*, 381 F. Supp. at 257. However, both cases concern contracts for the delivery of a regular supply of commodities, not commercial leases. The obligation to pay rent under a commercial lease is sufficiently distinct that the court does not find these cases persuasive.

Oak Street and RDR both argue that the contract is unambiguous and no extrinsic evidence is necessary to interpret it.[2] The court disagrees. The *force majeure* clause states:

**FORCE MAJEURE.** Neither party hereto will be liable for any failure to comply or delay in complying with its obligations hereunder if such failure or delay is, including but not limited not to, due to acts of God, inability to obtain labor, strikes, lockouts, lack of materials, governmental restrictions,

---

[1] Oak Street also raises an argument that the *force majeure* clause does not apply to the time period at issue because RDR failed to satisfy a "reasonable control" requirement Oak Street reads into the *force majeure* clause. The court has already ruled that the *force majeure* clause applies to the time period in question, so it will disregard Oak Street's extraneous argument.

[2] The court notes that neither party expressed a desire to submit extrinsic evidence to suggest how the parties intended the *force majeure* clause to operate under these circumstances. This is unsurprising, given the unprecedented nature of the COVID-19 pandemic and related government-ordered shutdowns.

2

enemy actions, civil commotion, fire, unavoidable casualty or other similar causes beyond such party's reasonable control (all of which events are herein referred to as "Force Majeure Events"). It is expressly agreed that neither party will be obliged to settle any strike to avoid a Force Majeure Event from continuing.

(A. 19.) The clause states in one part that neither party will be "liable" for failure to perform due to *force majeure* events, but seems to contemplate a general duty to mitigate damages for all *force majeure* events except a strike. The clause is silent on whether failure to mitigate damages means that a party is once again "liable" for failure to perform. Therefore, the contract is ambiguous on this point.

If a contract is ambiguous, then its interpretation is a question of fact. *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989. Absent a request for specific findings of fact, this court must assume that the District Court made all necessary findings that could be gleaned from the evidence before it. *Associated Builders, Inc. v. Oczkowski*, 2002 ME 115, ¶ 11, 801 A.2d 1008.

Therefore, this court must assume that the District Court found that the *force majeure* clause provides protection from default under these factual circumstances, even though RDR failed to mitigate damages. To find that RDR is not protected from a default under these circumstances would subject it to a bizarre contractual obligation: RDR would be entitled to use the *force majeure* clause as an excuse to pay decreased rent, but only if it paid at least the amount the court later determined it owes. Such a result would require an unreasonable reading of the contract that this court will not make.

The District Court's order is hereby AFFIRMED.

3

DATED: August 2, 2021

_____
Daniel I. Billings, Justice
Maine Superior Court

Entered on the Docket: 8/2/21

4