**MORIN BUILDING PRODUCTS CO., INC., Plaintiff,**

v.

**VOLK CONSTRUCTION, INC., Defendant.**

**No. CV-79-62-GF.**

United States District Court,
D. Montana,
Great Falls Division.

Oct. 2, 1980.

James L. Jones, Anderson, Brown, Gerbase, Cebull & Jones, Billings, Mont., for plaintiff.

Milton O. Wordal, Church, Harris, Johnson & Williams, Great Falls, Mont., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HATFIELD, District Judge.

This cause came on for hearing before this court sitting without a jury on June 23, 1980, and concluded on June 24, 1980. Plaintiff appeared in person and by its counsel, Mr. James L. Jones of the law firm of Anderson, Brown, Gerbase, Cebull and Jones, and defendant appeared in person and by its counsel, Mr. Milton O. Wordal of the law firm of Church, Harris, Johnson & Williams. The cause was bifurcated by stipulation of the parties with the issue of liability being heard at this time and the issue of damages being reserved for a later hearing following adjudication of liability. This court, having heard the testimony and received into evidence the exhibits offered by the parties and having considered all of the admissible and credible evidence, makes the following:

## FINDINGS OF FACT

1. Plaintiff (hereinafter Morin) is a Connecticut corporation having its principal place of business in the City of Bristol, Connecticut. Defendant (hereinafter Volk) is a Montana corporation having its principal place of business in the City of Great Falls, Montana.

2. The claims still pending before the court on defendant's counterclaim exceed, exclusive of interest and costs, the sum of TEN THOUSAND DOLLARS ($10,000.00).

3. Morin sued to recover its costs expended in the purchase and fabrication of custom manufactured metal building siding which defendant ordered. Morin also seeks engineering costs, overhead and recovery costs. Volk counterclaimed contending that the plaintiff had breached the agreement by failing to deliver the material within the time desired by plaintiff and seeks recovery of $40,118.36 in delay damages, plus costs. Since institution of the action, plaintiff has recovered its material and fabrication costs from its suppliers and now seeks only its engineering, overhead and recovery costs.

4. The subject of the contract was custom manufactured metal building siding. Because of the custom nature of the product, the steel for the siding had to be ordered and manufactured by a steel supplier. The particular color and type of paint or coating had to be ordered and produced. The steel and paint then had to be delivered to the painter (known as a "coil coater") for paint application and then to another contractor for "slitting" to the proper width. After these steps were completed, the material would then be delivered to Morin for forming and cutting.

5. On or about September 30, 1977, Volk Construction mailed to Morin Building Products Company, Inc., a letter soliciting price quotations for the custom metal siding to be used by Volk in its construction of an

addition to the recreation center at Malmstrom Air Force Base, Montana.

6. Subsequent to September 30, 1977, Morin submitted a telephone quotation, and on October 26, 1977, mailed to Volk its written proposal P78–6.

7. Article 25 of the Morin proposal specified terms under which the buyer (Volk) could cancel the order subject to cancellation charges. Page 2 of the proposal contained the following paragraph:

ACCEPTANCE OF THIS PROPOSAL This proposal is subject to Buyer's acceptance within thirty (30) days and to the subsequent approval by an Executive Officer of the Seller at Bristol. Thereupon it will become the entire agreement between the Buyer and the Seller notwithstanding any previous communications or negotiations whether oral or written. There are no covenants or agreements, inducements, guarantees, warranties, additions or considerations other than as set out specifically herein. Upon acceptance, this proposal will become a contract and any changes in the terms and conditions must be approved by an Executive Officer of the Seller at Bristol, Conn. The parties intend to be legally bound hereby and to be governed by Connecticut law upon the execution of this instrument as a contract. In the event that the Buyer issues his own purchase order or prepares a contract based on the proposal, the conditions herein shall be deemed to be incorporated in the said purchase order or contract unless exception is specifically taken thereto. (Underlining mine.)

8. The only term of Morin's Proposal P78–6 dealing with delivery was the following:

Schedule for commencement and completion to be as mutually agreed upon by Morin and the Buyer.

9. On December 1, 1977, Volk responded to Morin's proposal by mailing to Morin its Purchase Order No. RC–11–77.

10. No date for delivery was specified in the appropriate portions of Volk's printed Purchase Order. The general conditions set forth on the backside of the Volk Purchase Order contained the following provisions:

1. Acknowledgment:

(a) Immediately sign and return the confirmation of this order. Until this executed copy is received by the vendee, the right to cancel by oral or written notice is reserved.

(b) The entire contract between the parties consists of this purchase order and any documents incorporated by reference as stated herein, and no other acceptance or acknowledgment or other conditions will apply. Amendments, if any, will be made in writing by mutual agreement only and must be signed by both parties. (Underlining mine)

11. No exception was specifically taken by Volk to the general conditions contained in the Morin Proposal.

12. By letter dated December 14, 1977, Volk requested that all specifications and material be submitted to Volk for approval.

13. On January 4, 1978, Morin's Project Coordinator, A. C. Anderson, forwarded color charts to Volk for paint color selection. The letter advised:

Lead time required to have our paint supplier supply paint to our color coater is as follows:

Standard colors Six (6) to eight (8) weeks Special colors Ten (10) to twelve (12) weeks.

On January 5, 1978, G. F. McDuffee, Vice–President of Credit and Contract Administration for Morin, wrote to Volk concerning the omission of Morin's proposal form from Volk's Purchase Order of December 1, 1977; the letter states as follows:

We find that your Purchase Order does not completely describe the detail as outlined in Morin's Proposal to you of October 26th, per its number P78–6, as it relates to the materials which we intend to supply.

We, therefore, would appreciate having you indicate a notation upon your Purchase Order that the materials to be supplied will be in accordance with Morin's

Proposal, a copy of which is attached for your consideration.

15. On January 9, 1978, Volk submitted to Morin's request and returned the same Purchase Order with the following notation typed on the front of it:

Materials to be supplied will be in accordance with Morin's Proposal P78–6, copy attached.

A copy of the Morin Proposal was attached. The opening paragraph of the cover letter stated as follows:

Here is the same Purchase Order, which now includes the notation as per your Proposal P78–6. Hope this meets with your approval.

16. Roy Volk, President of the defendant corporation, testified that when he attached the copy of Morin's Proposal to his Purchase Order, he intentionally omitted the reverse side of page 1, containing Morin's standard terms and conditions, as a means of taking exception to them. He admitted on cross–examination that he did not call attention to this omission in the cover letter of January 9, 1978, or otherwise inform Morin of his objection to their terms. He admitted that it would have been easy for him to call attention to this omission, had he desired to do so.

17. The last sentence of Volk's cover letter of January 9, 1978 stated that they would require the material within ninety days. However, the portion of Volk's Purchase Order which was intended to specify the delivery date was, again, left blank. The attached Morin Proposal again stated only that the schedule for commencement and completion were "to be as mutually agreed upon . . . ."

18. On January 12, 1978, Morin returned a countersigned copy of the revised Purchase Order with a cover letter that acknowledged the reference to ninety days and warned Volk as follows:

Unless we can receive this color selection immediately, there will not be any opportunity for us to meet your ninety day schedule, since the material will require, in order to be placed with the coil coater and delivery of the basic material to the coating processor and in turn to our plant prior to entering it in our rolling schedule.

Therefore, we urge that you immediately inform us as to the color selection in order that we may arrange for the delivery of the materials. Unless this is done, we must inform you that we will not be able to approximate your tentative requirement date.

19. On January 19, 1978, following a telephone conversation between the parties, Morin wrote to Volk and again advised them of the 12–week lead time required after color selection was made.

20. On January 24, 1978, Volk wrote to the Army Corps of Engineers concerning the color selection and advised that agency of the 12–week lead time requirement.

21. On January 30, 1978, Volk wrote to Morin advising them of the color selection and stating as follows:

As of your last letter, you stated production of this special color would take approximately twelve (12) weeks. Please inform us as to a tentative delivery date.

Twelve weeks from Morin's receipt of the letter would have been approximately May 1, 1978.

22. On February 2, 1978, McDuffee of Morin, wrote to Volk concerning scheduling and delivery and concluded as follows:

This would place our tentative shipping date to approximately May 1st, and we, therefore, must ask for your approval of this schedule based upon commitments from our vendors.

23. On February 9, 1978, Volk responded to Morin stating that they would be ready for the material within 60 days and requesting that delivery be expedited. The letter, written by Volk's President, concluded, "You realize we are at your mercy–please keep in touch."

24. On February 13, 1978, Morin responded to Volk's letter stating that the earliest possible scheduling date for production (not delivery) would be mid–April, but again stated that such schedule was "tentative".

25. On February 13, 1978, after receiving the color selection, Morin forwarded to Volk its "Acknowledgment and Acceptance" form. The reverse side of this form contained the same general conditions as the original Morin Proposal. On its face the form stated that acceptance of the order was based on the terms and conditions set forth "on the face and the reverse side hereof. ..." Delivery was stated to be "as mutually agreed".

26. On March 9, 1978, Volk wrote to Morin requesting delivery by April 1st.

27. On March 29, 1978, representatives of the parties discussed by telephone, an addition to the Contract for soffit panels with trim flashiongs and accessories. On March 31, 1978, Morin wrote to Volk advising that such an addition would require a change order to the Contract of $3,297.00

28. On April 11, 1978, Volk mailed to Morin a Contract Change Order. In that portion of the form specifying "Contract Completion Time", Volk typed in the word, "None". On April 19, 1978, Morin returned a countersigned copy of the Contract Change Order to Volk without amendment.

29. On April 24, 1978, D. C. Davis, Vice-President of Volk, wrote to Morin as follows:

Today, I had a phone conversation with Mr. Cliff Priest, in regard to the fabrication and delivery of material, ref. job M78–1072 and est # P–78–6. He informed me that your company had not received the stock material from your supplier, but it is scheduled to arrive May 1, 1978.

The next problem seems to be production scheduling of the panels. This item was very undefined due to the unsureness of the raw material delivery and the type of panel that plant would be running at the time you received the raw material.

Due to all the uncertainties involved and no real commitment to our Company to an actual delivery date, this leaves us in a very difficult position. We do have letters from you dated February 13th and February 2nd concerning delivery; if either of these schedules could be met, this would be a livable situation. As you know, this is a Corps of Engineers project with a very tight schedule.

30. Morin had ordered the material for the siding from U.S. Steel on January 6, 1978, for delivery to the coil coater (painter), Prior Coated Metals ("PCM"), the week of March 6, 1978. However, when it arrived at PCM, the material was rejected as having a dross on the surface of the material. The material was returned to U. S. Steel and reprocessed. The reprocessed material was redelivered to a second coil coater, known as Chesapeake, by U. S. Steel on April 28, 1978. According to G. F. McDuffee, Vice President of Credit and Contract Administration for Morin, upon redelivery of the coils to Chesapeake, Chesapeake without advising Morin first rejected the material for dross the same as PCM had. Later, again without the knowledge or consent of Morin, Chesapeake agreed with U. S. Steel to paint the coils it had rejected. The coils were then scheduled for painting by Chesapeake in the early part of May. A mechanical breakdown in the Chesapeake plant resulted in a shutdown of the Chesapeake plant for approximately four weeks during May and early June.

31. The date for delivery of the materials was not specified by the purchase order or the change order. After considerable exchange of correspondence over color selection Morin finally advised Volk that in spite of Volk's request for delivery the second week in April, 1978, Morin's tentative shipping date was May 1, 1978. Volk was requested to approve this schedule. Volk acknowledged this information and requested that everything possible be done to expedite the order to insure the earliest possible delivery.

32. During the month of June, employees of the two parties were in regular telephone communication concerning the problems with delivery and the parties discussed the possibility of a substitute material. On June 16, 1978, Morin offered Volk substitute material which could have been delivered before July 1, 1978. Volk obtained telephonic approval from the Army Corps

of Engineers for the substitution of this siding, which was in Morin's inventory, but Volk failed to send Morin a requested telegram accepting the substitution material.

33. In a letter dated June 22, 1978, Volk wrote to Morin as follows:

On June 20, 1978, Mr. Cliff Priest informed Volk Construction, Inc., of a production date of July 5, 1978, two weeks from date of telephone conversation. This letter is to inform your company that if this production date is not met, you will be held completely responsible by suit for all costs incurred deemed necessary to obtain material from another supplier.

34. On June 22, 1978, the material was received by Morin from Chesapeake. The material was unacceptable and rejected by Morin.

35. By telephone on June 23, 1978, and in writing on June 28, 1978, Morin advised Volk of three options as follows:

1. We have received the material from Chesapeake, but it was rejected by our plant superintendent, as the finish was not up to our standards for our panels. If he wished, he could come up to our plant, look at the material and if acceptable to you, we would roll this in our next rolling of F–12 which would be in two (2) to three (3) weeks, as we have a plant shutdown for one (1) week, which is the week of July 3, 1978.

2. That we could use the MC–33, 20 gauge and roll that in two (2) to three (3) weeks.

3. That we could reorder new materials which would take two (2) to three (3) months.

36. On June 30, 1978, Morin wrote to Volk as follows:

The following is a follow–up to my letter to you dated June 28, 1978 relative to the above project, and relative to our telephone conversation of June 28th wherein we discussed both the material problems and the fact that we cannot accept financial responsibility for these delays.

I stated in the next to the last paragraph 'that we could not process this order any further in lieu of the implications expressed in your letter of June 22, 1978.' I wish to further clarify the intent of that statement and state that we cannot proceed with the fabrication of your panels until there is a written retraction of that statement.

We cannot assume any financial responsibility for the series of events that have caused a delay in the delivery of your material, or might cause even a greater delay, prior to the time we can fabricate, ship and deliver materials to this project.

37. On June 28, 1978, Volk wrote to the Army Corps of Engineers and requested permission to obtain a replacement material from another supplier, "by August 11, 1978". On July 6, 1978, Volk wrote to Morin:

I want to thank you for your letter explaining the problems you have encountered over the past several months in your efforts to procure and fabricate material for our P. O. RC–11–77, dated December 1, 1977.

In reviewing the alternatives noted in your letter, I believe your statement that we find ourselves at a stalemate, is quite true.

None of your alternatives 1, 2 or 3 is acceptable. 1. If you have rejected the material, we would also reject it. 2. Using the MC–33 20 gauge would require a substantial credit to us and is required by the Corps of Engineers, which you indicated is not available. 3. Two to three months delivery is out of the question. We have decided to exercise our rights as outlined in our mandatory general conditions per our P.O. RC–11–77 and change order # 1, dated April 11, 1978.

You are in default and we are cancelling our P.O. # RC–11–77 and change order # 1. Refer to Mandatory General Conditions paragraph # 4, 7, 8, 10, 11 and 12. As per our P.O., any cost incurred by Volk Construction in resolving this matter will be borne by Morin Building Products.

38. On July 12, 1978, Morin wrote Volk and advised that it would bill Volk under Article 25 "Cancellation" of the Proposal and Acknowledgment and Acceptance for the appropriate cancellation charges.

39. Volk communicated with another supplier in late June but did not place its order with a replacement supplier until July 25, 1978. The replacement material ordered was a standard siding in inventory and was delivered in the latter part of August 1978.

40. It appeared that at the time of Volk's cancellation of the contract for Morin's default that Morin was still unable to deliver materials conforming to the contract with Volk. Further, the delay in delivery of conforming goods was then estimated by Morin to be an additional two to three months. The only other alternatives offered to Volk were to accept materials from Morin of a lighter gauge but without credit for reduction in quality or to accept the gauge of material originally ordered from a batch already rejected by Morin and its own suppliers as being of substandard quality. Morin attributed its inability to deliver the materials conforming to the original contract to delays resulting from unsatisfactory work and equipment breakdowns on the part of its painting subcontractor.

41. Morin experienced difficulty with U. S. Steel, which was to supply the galvanized rolled steel from which Volk's order of siding would be made; with Prior Coated Metals, and with Chesapeake Finished Metals, the two painting firms involved in the attempt to paint the siding material. U. S. Steel was asked to reprocess the defective steel originally supplied, but Morin relied on the painting firms to examine these shipments. Morin changed painting firms ostensibly to secure better scheduling when Prior Coated Metals rejected the first steel shipment. Volk was not advised of these early processing delays for more than a month and was never advised that U. S. Steel was called upon to reprocess its first shipment. Volk was unaware of the identity of Morin's suppliers and subcontractors and had no hand in their selection. Volk was also unaware that Morin has settled with both U. S. Steel and Chesapeake for the failure of these firms to furnish quality materials relating to the Volk order. Although not significantly persuasive to the Court, it does smack of unfairness to allow Morin to recover against Volk seemingly for these same failures when the claims against the suppliers have not been preserved.

42. Morin is experienced in construction of buildings through the activities of a sister corporation and knew well the importance enclosure of a structure with siding plays in creating the necessary work environment for subsequent steps in construction. Morin also knew that Volk's need for this siding material predated Morin's scheduled shipping date of May 1, 1978, by roughly a month.

43. Morin failed to ship any conforming goods to Volk for more than two months after its own scheduled delivery date of May 1, 1978, and offered no assurance of delivery or conforming goods for two to three months more, late August or September.

Taking Morin's explanations for its default in delivering they nevertheless do not appear to be anything so extraordinary as to be unforeseeable, particularly given Morin's experience with its suppliers. Nor has Morin offered evidence that alternate suppliers and subcontractors were unavailable so as to demonstrate that the failure of its original sources rendered performance impracticable. The inference is to the contrary where it appears Morin subsequently ceased doing business altogether with these sources and established business relationships with other suppliers. The provision in Morin's proposal form seeking to avoid responsibility for occurrences beyond its control makes no reference to failure of suppliers or subcontractors to perform.

44. Moreover, Morin's refusal to proceed with performance of the contract in the face of Volk's request for assurance of performance by a specified delivery date was an unwarranted repudiation by Morin of the contract and constitutes a material breach of the contract as well.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and subject matter of this cause pursuant to diversity jurisdiction. Plaintiff and defendant have diversity of citizenship and the amount in controversy, including the counterclaim by defendant, is in excess of $10,000 exclusive of interest and costs. 28 U.S.C. § 1332.

2. This action is governed by the provisions of the Uniform Commercial Code contained in Title 30 the Montana Code Annotated.

3. Defendant Volk, by purchase order dated December 1, 1977, made an offer to Morin which Morin accepted on December 5, 1977. A confirmation document was also signed by Morin dated January 5, 1978. Volk's terms of sale became part of the subsequent contract with the additional term that materials supplied be in accordance with Morin's proposal document. See § 30–2–207 M.C.A. No other material terms contained in Morin's proposal became part of the contract between the parties.

4. Although not specified in the contract, subsequent correspondence between the parties indicates the time for shipment or delivery of the metal siding from Morin to Volk was to be approximately May 1, 1978 (90 days from the January 30th letter from Volk advising Morin that the color of the siding was to be "Buckskin 500"). Morin acknowledged the May 1, 1978 delivery date by letter dated February 2, 1978. The Court concludes that even if the scheduled shipping date of May 1, 1978 were not one expressly agreed upon, it is, under all the facts and circumstances, a shipping date which would be implied as commercially reasonable. § 30–2–309(1) M.C.A.

5. Morin was advised that time was the essence of the agreement yet was unable to perform the contract due to problems it experienced with its suppliers and subcontractors. Morin breached the contract when it was unable to timely deliver the metal siding as ordered.

6. Morin's failure to deliver the metal siding is not excused by the problems it experienced with its subcontractors and suppliers. The problems encountered in manufacturing this siding were or should have been contemplated by Morin at the time the contract was formed. The Court agrees with the conclusion made by the Court in *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 991 (5th Cir. 1976) that the standard for excusable delay and default is commercial impracticability. See § 30–2–615, M.C.A. The Court states:

> The rationale for the doctrine of impracticability is that the circumstance causing the breach has made performance so vitally different from what was anticipated that the contract cannot reasonably be thought to govern. (citation omitted) However, because the purpose of a contract is to place the reasonable risk of performance on the promisor, he is presumed, in the absence of evidence to the contrary, to have agreed to bear any loss occasioned by an event which was foreseeable at the time of contracting. (citations omitted)

*Eastern Air Lines, supra,* at 991–992.

In this case, Morin assumed the risk of performance; it assumed the risk that delivery of the metal siding would be delayed by problems with its subcontractors and suppliers. There is nothing in the contract between the parties which excuses Morin for delays caused by its subcontractors or suppliers. Thus Morin had an obligation to timely deliver the metal siding by May 1, 1978 to Volk. Morin was unable to timely and deliver and thus breached the contract for which Volk is entitled to reasonable damages.

7. Volk is entitled to recover damages, together with attorney fees and costs, on its counterclaim against Morin for breach of contract.

8. Morin is not entitled to recover against Volk for the latter's cancellation of the contract.