**STEEL INDUSTRIES, INC., Plaintiff,**

v.

**INTERLINK METALS AND CHEMICALS, INC., Interlink Metals, Inc., Igor Rakelson, and Yefim Raykhelson, Defendants.**

**Civil Action No. 95–40278.**

United States District Court,
E.D. Michigan,
Southern Division.

July 11, 1997.

Mark E. Hauck, Dykema Gossett, Detroit, MI, for Plaintiff.

Ben T. Liu, Birmingham, MI, for Defendants.

*OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I*

GADOLA, District Judge.

On August 24, 1996, Plaintiff, Steel Industries Inc., a division of International Materials Group ("IMG"), filed the instant action against Interlink Metals and Chemicals, Inc. and Interlink Metals, Inc. (collectively "Interlink"),[1] Igor Rakelson and Yefim Raykhelson. The complaint contains seven counts, Count I alleging that Interlink breached a contract to deliver approximately 2.5 million pounds of steel.[2]

On September 13, 1996, IMG filed a motion for partial summary judgment on Count I, arguing that there was no genuine issue of material fact that Interlink breached a duty to deliver 884,488 pounds of steel. This court granted that motion for partial summary judgment on November 19, 1996.[3] Presently, this matter is before this court on IMG's motion for partial summary judgment on the remainder of steel referenced in Count I, approximately 1.6 million pounds. IMG argues that there is no genuine issue of material fact that Interlink breached its contractual obligation to deliver that quantity of steel.

## FACTS

The facts of this dispute are clearly delineated in this court's November 18, 1996 Opinion and order granting IMG's motion for partial summary judgment on Count I. Nevertheless, this court will once again provide a factual summary to facilitate an understanding of the instant opinion and order.

Plaintiff IMG manufactures and supplies steel products to various industries. part of its business, it purchases bar steel as a raw material. In November, 1993, defendant Yefim Raykhelson ("Raykhelson") on behalf of defendant Interlink, a broker of steel and raw materials, solicited IMG's business and offered it steel blooms and billets. Gerald P. Townes ("Townes"), IMG's Raw Materials Purchasing Manager, indicated that IMG would not be interested in procuring steel blooms and billets, but would be interested in purchasing forged steel bars from Interlink.

After learning of IMG's needs, Interlink sought out and found a Russian source to produce forged steel bars for IMG, namely the Obukhovsky Mill (or "Mill").[4] After presenting IMG with a satisfactory sample of forged steel bars from this Mill, IMG executed a series of purchase orders ("P.O.'s") for the purchase and delivery of various grades of forged steel bars. Germane to the instant motion for partial summary judgment are the following sixteen P.O.'s:

| P.O Date | P.O. Number | Steel Type | Delivery Date |
|---|---|---|---|
| Feb. 22, 1994 | 1004 | 4140 Steel | July 1, 1994 |
| Feb. 22, 1994 | 1005 | 4340 Steel | July 1, 1994 |
| Feb. 22, 1994 | 1006 | 1030 Steel | July 1, 1994 |
| Feb. 22, 1994 | 1007 | 1030 Steel | July 1, 1994 |
| Feb. 22, 1994 | 1008 | 1030 Steel | Sept. 1, 1994 |
| Feb. 22, 1994 | 1009 [5] | 1045 Steel | July 1, 1994 |
| April 4, 1994 | 1010 | 4140 Steel | Sept. 1, 1994 |
| April 4, 1994 | 1011 | 4140 Steel | Sept. 1, 1994 |
| April 4, 1994 | 1012 | 4340 Steel | Sept. 1, 1994 |
| April 4, 1994 | 1013 | 4340 Steel | Sept. 1, 1994 |
| April 4, 1994 | 1014 | 1045 Steel | Sept. 1, 1994 |

concessions (e.g., consent to a price increase and a waiver or IMG's rights to sue for breach of contract of the remaining, unfilled purchase orders) and instead, improperly shipped the steel to other customers.

---

1. Interlink Metals and Chemicals, Inc., Interlink Metal and Chemical Corporation, and Interlink Metals, Inc. are all successors in interest to Interlink Metals and Chemicals, Inc. and Interlink Metal and Chemical Corporation.

2. In Count I of its complaint, IMG charges defendants with non-delivery of 2,560,880 pounds of steel. However, in its brief accompanying the instant motion, IMG indicates that Interlink breached a contract to deliver 2,760,492 pounds of steel.

3. In the prior order of November 19, 1996, this court ruled that Interlink breached a duty to deliver 884,488 pounds of steel under various P.O. contracts in that Interlink's supplier, the Obukhovsky Mill, produced that steel but Interlink did not ship the steel to IMG absent some

4. Interlink communicates with the Obukhovsky Mill through an intermediary company, Energormash Export.

5. P.O.'s 1004–1009 were re-acknowledged in April 1994 after Interlink recognized that it did not have the capability to deliver same larger diameter steel, and upon Interlink's insistence that certain language regarding letters of credit be modified.

| April 4, 1994 | 1048 | 4150 Steel | Unspecified |
| April 4, 1994 | 1049 | 8620 Steel | Unspecified |
| April 4, 1994 | 1053 | 4150 Steel | Unspecified |
| April 11, 1994 | 1050 | 8620 Steel | Sept. 1, 1994 |
| May 30, 1994 | 1060 | L–6 Tool Steel | October, 1994 |

It was the parties' understanding that the prices indicated on the initial six P.O.'s (P.O.'s 1004–1009) were firm, introductory prices.[6] In executing various P.O.'s after February 22, 1994, however, (P.O.'s 1010, 1013, 1014, and 1053), Interlink allegedly reserved the right to modify prices.[7]

After all sixteen P.C.'s were issued, IMG awaited its first shipment of steel to arrive in July, 1994. On June 20, 1994, approximately two weeks before the expected delivery date, Raykhelson sent a letter to IMG stating that it anticipated "freight delays" for the orders to be delivered on July 1, 1994 (P.O.'s 1004, 1005, 1006, 1007 and 1009.).[8] Then, on July 10, 1994, Interlink sent a letter to IMG stating that "excessive defects" were found in the first shipment of steel by the final sonic testing control operation at the Mill and that the Mill would therefore have to reproduce IMG's first order, further postponing delivery.

In response to the letters sent by Interlink, IMG sent a letter dated August 31, 1994 to Interlink demanding adequate assurances. The August 31, 1994 letter stated that due to the delay in steel delivery, IMG was "unable to satisfy orders from [its] customers" and that "it would take appropriate legal action" if "realistic delivery commitments and material" were not given to IMG.

In response to IMG's demand letter, Interlink's President, Igor Rakelson,[9] sent a Letter dated September 9, 1994, wherein he: (1) acknowledged that Interlink was experiencing problems with the Mill; (2) denied any contracts existed between IMG and Interlink;[10] and (3) denied that Yefim had authority to bind Interlink.[11] Notwithstanding this letter, on October 21, 1994 Interlink delivered approximately 40,000 pounds of steel, honoring the price specified in the initial P.O.'s.

On March 4, 1995, Raykhelson mailed notification to IMG that it would only deliver more steel to Interlink if IMG agreed to pay higher prices for 1030, 1045, 4140, 4150, 4150 (hollow), 4340, 8150 and 8620 grade steel. Interlink's reason for extracting higher prices from IMG was simply that the Mill was demanding higher prices from Interlink and could not "continue production under present prices due to negative cash flow."[12] IMG, in response, sent a letter dated March 17, 1995 to Interlink demanding that Interlink: (1) explain the reasons IMG's orders were delayed; (2) explain the reason the raw material increases applied to acknowledged orders over one year old; and (3) provide an anticipated shipment schedule. Igor sent letter dated March 28, 1995 to IMG, wherein he once again denied the existence of any

6. Allegedly, the prices Interlink offered IMG were low. For instance, Interlink's price for 1030 grade steel was approximately 69% lower than IMG's other supplier, Ellwood City Forge.

7. Raykhelson handwrote the following on P.O.'s 1010, 1011, 1014 and 1053: "[p]rices are subject to change after approval of first shipments" These alleged reservations of the right to modify prices have no impact on the issues presented in plaintiff's motion for partial summary judgment on Count I, but may have a bearing on any required later determination of damages.

8. Allegedly, Interlink predicted freight delays because it could not secure a firm schedule for shipment of the steel Raykhelson testified at his deposition that, "[t]he steamship line couldn't give [Interlink] any even rough dates of when the ship will be available." (Raykhelson Dep. at 65).

9. Igor Rakelson is the son of Yefim Raykhelson.

10. In an order entered by this court on March 25, 1996, the parties stipulated to the fact that IMG and Interlink entered into contracts embodied in P.O.'s 1004–1060.

11. The authority of Raykhelson to bind Interlink is no longer contested by Interlink. In an order signed by this court on March 25, 1996, the parties stipulated to the fact that "[d]efendant Raykhelson entered into [ ] contracts on behalf of Interlink Metals and Chemicals, Inc. At the time the contracts were executed, Raykhelson had authority to contract on behalf of Interlink Metals and Chemicals, Inc."

12. Allegedly, the Mill experienced raw material and energy resource cost escalation, claimed that it could not continue steel production at the current prices, and thus charged Interlink higher prices. Raykhelson acknowledged at his deposition that Interlink in turn, "made the decision to pass that price increase onto Steel Industries." (Raykhelson Dep. at 149).

contracts and claimed that the entity with which IMG negotiated the P.O.'s had not been operative for two years.[13]

Notwithstanding the aforementioned correspondence, in April 1995, Interlink made a *second delivery* of 160,000 pounds of steel to IMG at the prices agreed upon by the parties in the P.O.'s, bringing the grand total of steel shipped to IMG to approximately 200,000 pounds out of an estimated 2.5 million pounds ordered. Since that delivery of 160 000 pounds of steel in 1995, Interlink has not made any further tender of goods to IMG.[14]

On August 24, 1995, IMG filed the instant action charging Interlink at Count I of a seven count complaint with breach of contract to deliver approximately 2.5 million pounds of steel. On November 18, 1996, this court granted IMG partial summary judgment on that count, holding that Interlink breached its contractual duty to deliver 884,- 488 pounds of steel. Currently this court is confronted with IMG's motion for partial summary judgment as to the remainder of Count I, an estimated 1.6 million pounds of steel.

## ANALYSIS

### 1. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties."

*Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986) This burden "may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook*

---

**13.** In an order dated March 25, 1996, the parties stipulated to the fact that Interlink Metals and Chemicals, Inc., Interlink Metal and Chemical Corporation and Interlink Metals, Inc. ("Interlink") are successors in interest to the companies with whom IMG signed the P.O.'s, those being Interlink Metals, Inc. and Interlink Metals and Chemicals, Inc.

**14.** To date, Interlink allegedly has fulfilled the following orders: (1) 30,875 pounds of 1030 steel ordered in P.O. 1006; (2) 58,227 pounds of 1045 steel ordered in P.O. 1009; and (3) 111,116 pounds of 8620 steel ordered in P.O. 1049.

*v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### 2. Whether Interlink Breached a Duty to Deliver Approximately 1.6 Million Pounds of Steel

IMG contends that it is entitled to partial summary judgment with respect to approximately 1.6 million pounds of steel referenced in Count I of its complaint. IMG asserts that there is no genuine issue of material fact that Interlink flagrantly breached the parties' contract by not delivering said steel as promised.

Interlink maintains that it has raised a genuine issue of material fact which supports a viable defense to IMG's breach of contract claim, thus precluding a grant of summary judgment to IMG on that claim. More specifically, Interlink contends that there is a genuine dispute as to whether Interlink's source of supply for IMG's order, the Obukhovsky Mill, has the capability of producing the approximately 1.6 million pounds of steel necessary to fulfill IMG's order. According to Interlink, the Mill's inability to produce the steel necessary to fulfill IMG's order is a *cause beyond Interlink's reasonable control,* which relieves Interlink from its contractual obligation to deliver the steel. In making such an argument, Interlink relies on a boiler-plate provision printed on the reverse side of the P.O.'s, so-called "Paragraph 2," which provides:

> 2. DELIVERIES. Seller will not be liable for damages for [non-]delivery [15] *die to causes beyond its reasonable control.* If

Seller, however, for any reason does not comply with Buyer's delivery schedule, Buyer in addition to any other rights, may either approve a revised delivery schedule or may terminate such order without liability to Seller on account thereof.

(emphasis added).

### a. The Contract Was Not A Sole Source Supply Contract

■ The threshold issue confronting this court is whether the contract between IMG and Interlink was for steel produced *exclusively* by the Obukhovsky Mill. If, in viewing the evidence in a light most favorable to Interlink, no reasonable juror could conclude that the deal between IMG and Interlink was for steel *only* from the Obukhovsky Mill, then surely the Obukhovsky Mill's alleged inability to manufacture the steel ordered by IMG would not be a *cause beyond Interlink's reasonable control* excusing it, under Paragraph 2, from its delivery obligation. To the contrary, if the bargain between the parties did *not* identify any particular source of supply (*i.e.,* the Obukhovsky Mill), then Interlink bore the risk of its chosen supplier's nonperformance and had a duty to exhaust all reasonable alternative means of fulfilling the contract (*e.g.,* procuring steel from alternative sources) before it was excused from its contractual obligation by the plain language [16] of Paragraph 2.[17] *See Neal–Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283 (7th Cir.1974) (seller's duty to deliver potash was not excused by an exculpatory clause incorporating *inter alia,* the impracticability doctrine when seller's principal source of supply closed); *Morin Bldg. Prod-*

---

**15.** The first sentence of Paragraph 2 reads as follows: "Seller will not be liable for damages for delivery due to causes beyond its control." In the November 18, 1996 opinion and order granting plaintiff's motion for partial summary judgment, this court construed Paragraph 2 as reading instead "Seller will not be liable for damages for non-delivery due to causes beyond its control" and will do so again here for the reasons expressed in the prior opinion and order.

**16.** *G & A Inc. v. Nahra,* 204 Mich.App. 329, 331, 514 N.W.2d 255 (1994) (holding that language of a contract should be give its ordinary and plain meaning)

**17.** This court previously held that Paragraph 2 was a force majeure provision, which did not

embody an impracticability defense. The word *"force majeure"* means literally "superior force" and the typical *force majeure* clause "specifically indicate[s] problems beyond the reasonable control of [a party to the contract] that will excuse performance" of that party. *Black's Law Dictionary* 645 (6th ed.1990).

In deciding the issue at hand, the law of contract construction, *force majeure,* and impracticability (under the Restatement (Second) of Contracts and the Uniform Commercial Code) all dictate the same result. This court will thus rely on cases involving all of these doctrines when interpreting the meaning of Paragraph 2 and resolving the instant motion.

**1052**

*ucts Co. v. Volk Const.,* 500 F.Supp. 82 (D.Mont.1980) (court found that nothing in the contract, not even a clause relieving the seller of occurrences beyond its control, excused the contractor from its duty to timely deliver metal siding when the contractor experienced problems with its suppliers and sub-contractors; seller "assumed the risk that delivery of the metal siding would be delayed by problems with its subcontractors and suppliers"); *Barbarossa and Sons, Inc. v. Iten Chevrolet, Inc.* 265 N.W.2d 655, 660 (Minn.1978) (holding that seller was not excused for non-delivery of a truck to buyer on impracticability grounds where seller's supplier, General Motors Corporation ("GM"), canceled seller's order and refused to manufacture the truck; seller neither specifically identified the truck it agreed to deliver as one to be manufactured by GM on a special order nor did it make its obligation to deliver the truck contingent upon GM's agreement to manufacture the truck, as it could have) *Compare Selland Pontiac–GMC, Inc. v. King,* 384 N.W.2d 490 (Minn.App.1986) (holding that since seller's supplier was specified in the contract, seller was relieved from its obligation to deliver school bus bodies when seller's supplier ceased manufacturing them); *Olson v. Spitzer,* 257 N.W.2d 459 (S.D.1977) (holding that the seller was excused from delivering farm equipment by a clause in the parties' agreement making the seller's duty to deliver equipment "subject to [its] ability to obtain such Equipment from the manufacturer").

Contrary to Interlink's assertion that the Obukhovsky Mill was specified as the *only* source of supply by IMG, this court finds that it was not. Indeed, no reasonable juror could arrive at such a conclusion. This is because Interlink has not adduced *any* evidence showing that IMG contracted with Interlink for steel to be manufactured only by this Mill. Nor has Interlink pointed to any evidence of an agreement between the parties incorporating the contract between In-

terlink and the Obukhovsky Mill into the contract between Interlink and IMG. To be sure, the P.O.'s, which embody the contracts between the parties, do not mention the Obukhovsky Mill at all.[18] *Compare Scialli v. Correale,* 97 N.J.L. 165, 117 A. 255 (1922) (holding that a crop failure discharged a seller of grapes from delivery of grapes because the seller expressly limited his obligation to deliver grapes *only* from a certain plot of ground on which the crop failure occurred). Thus, since the contract between Interlink and IMG was not a sole source supply contract, this court finds that the risk of the Obukhovsky Mill's alleged failure to produce the steel was a risk assumed by Interlink. In other words, Interlink at all times bore the risk that the Obukhovsky Mill would not be able to manufacture the steel ordered by IMG and that Interlink might therefore have to obtain the steel from a different mill at a higher price.

■ Interlink offers a creative yet unpersuasive argument in opposing IMG's motion for summary judgment. Interlink contends that IMG must have assented to a contract for steel *solely* from the Obukhovsky Mill because IMG accepted Interlink's low prices, with full knowledge of why they were low. Interlink asserts that it was able to offer favorable prices to IMG because the Obukhovsky Mill, and this Mill only, offered favorable prices to Interlink which Interlink passed on to IMG.

Assuming that IMG was aware of Interlink's dependence on the Mill for production of IMG's order, and was further aware of the alleged reason Interlink offered low prices to IMG,[19] Interlink has offered no law to support its position that such knowledge amounts to a meeting of the minds between Interlink and IMG for a sole source supply contract. Presumably, Interlink has cited no authority because there is no such authority.

■ Interlink also seems to be making some sort of "equity" argument, contending

---

**18.** The P.O.'s *do* identify the "Port" from which the steel is going to be shipped as "Russia," but the P.O.'s do *not* make any reference to the Mill.

**19.** There is conflicting evidence as to whether IMG was aware of why Interlink was offering IMG the prices it offered. In the affidavit of Raykhelson dated January 21, 1997, he avers that he told Townes that IMG's order would be

manufactured by a mill in Russia that had never before produced the type of steel procured by IMG and that was one reason why Interlink could offer IMG low prices. Yet, at the deposition of Townes, he testified that Raykhelson "didn't tell [him] any reason why the prices were what they were." (Townes Dep. at 134.)

that it would be unfair to assign Interlink the risk of the Mill's failure to produce the steel when IMG allegedly knew that Interlink had secured a supplier which would be producing IMG's order at a low cost on a purely experimental basis. Insofar as Interlink is making such an argument, this court rejects it. The result reached by this court *is* fair when one considers that Interlink could have chosen *not* to pass on to IMG the low prices that the Mill offered Interlink. Interlink was not bound to pass on the Mill's prices, and indeed, could have charged IMG significantly higher prices for the steel in order to protect itself from the contingency of the Mill's nonperformance. Or, it could have passed the Mill's prices on to IMG while simultaneously shielding itself contractually from the foreseeable[20] risk that the Obukhovsky Mill might rot be able to produce the steel.

In short, this court finds that no reasonable juror could conclude the bargain between Interlink and IMG was one for a sole source of supply. Here, the buyer, IMG, contracted with a broker, Interlink, for delivery of steel in different grades and sizes (and in compliance with SII quality standards), but afforded Interlink **complete discretion** in choosing a source of supply for such steel.[21] Accordingly, Interlink was assigned the risk that its chosen source of supply (in this case the Obukhovsky Mill) would be unable to perform on time or unable to perform at all. To interpret Paragraph 2 in a manner consistent with such an assignment of risk is to interpret Paragraph 2 as meaning that Interlink was **not** excused of its contractual duty to deliver **solely** by the Obukhovsky Mill's alleged manufacturing problems,[22] but rather

was excused only after employing, to no avail, all reasonable, practical alternatives of fulfilling the contract, for only after exhausting all reasonable alternatives would it have been beyond Interlink's reasonable control to deliver the steel. *Chemetron Corp. v. McLouth Steel Corp.*, 381 F.Supp. 245, 257 (N.D.Ill.) (holding that a *force majeure* provision did not relieve seller of its contractual obligation to deliver Liquid products; such a provision obligated the seller to employ reasonable alternative means to fulfill its obligation which seller did not do) (applying Michigan law), *aff'd*, 522 F.2d 469 (7th Cir. 1974). *Cf. Luria Bros. & Co. v. Pielet Bros. Scrap Iron & Metal*, 600 F.2d 103, 112 (7th Cir.1979) (holding that since seller failed to introduce evidence showing that substitute scrap was not available, his duty to deliver nonalloy steel scrap was not excused by the impracticability doctrine) (*citing Chemetron*, 381 F.Supp. at 257); *Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc.*, 265 N.W.2d 655, 659 (Minn.1978) (finding that buyer did not contract with seller for any particular source of supply and thus, seller's obligation to deliver was "absolute"); Restatement (Second) of Contracts § 261, cmt. e (1981) ("if a party contracts to render a performance that depends on some act by a third party, he is not ordinarily discharged [on impracticability] grounds because of a failure by that [third] party because this is also a risk that is commonly understood to be on the obligor").[23]

**b. Interlink Did Not Employ All Reasonable Alternatives**

In regard to whether, based on the evidence proffered by the parties, a reason-

---

**20.** *See* Rakelson Dep. at 74–78 stating that prior to contracting with IMG, Interlink had encountered difficulties obtaining goods from Russia.

**21.** It should also be noted that Raykhelson testified at his deposition that he never told Townes that "the steel ordered might never be delivered." (Raykhelson Dep. at 96). He further testified that he "guaranteed" delivery of the steel. (Raykhelson Dep. p. 101).

**22.** The same result would be manifest under the law of *force majeure* and/or the Restatement (Second) of Contracts or Uniform Commercial Code's doctrines of impracticability, Mich. Comp Laws § 440.2615.

**23.** This court need not reach the issue of whether the Mill has the ability to produce the steel. This is because even if the Mill was and is truly unable to produce the steel, this alone would not excuse Interlink from its duty to deliver steel. This court does note, however, that there seems to be a genuine issue regarding the Obukhovsky's ability to produce the steel. For instance, Interlink submitted the affidavit of Alexander Paretskey. First Deputy of General Director of the Obukhovsky Mill. He avers that:

[i]n 1994, 1995, and 1996 the [M]ill was unable to produce any steel for the American grades 4340, 6150 and 1030 normalized. Moreover, the [M] ill was unable to produce

able juror could conclude that Interlink employed all reasonable practical means of fulfilling its contractual obligation, this court finds that lie or she could not.[24] At his deposition, Raykhelson described the efforts Interlink took when delivery problems with IMG's order became evident to him. These efforts were meager and consisted of merely contacting an unspecified number of Russian suppliers to ascertain whether they could produce the type of steel ordered by IMG. Not one of the sources contacted, for reasons unbeknownst to this court, could do so.[25] (Raykhelson Dep. at 136–87). It is undisputed that Interlink never sought out any American sources, which would have been a reasonable alternative given the circumstances.

In short, based on the evidence presented by the parties, viewed in a light most favorable to Interlink, this court finds that Interlink's non-delivery of approximately 1.6 million pounds of steel constituted a breach of contract, which was not excused by Paragraph 2 or otherwise, due to the alleged production difficulties of the obukhovsky Mill. The matter of obtaining a source for steel ordered by IMG was entirely the responsibility of and at all times within the control of Interlink.

### *ORDER*

**IT IS HEREBY ORDERED** that STEEL INDUSTRIES, INC.'s January 13, 1997 motion for partial summary judgment with respect to approximately 1.6 million pounds of steel referenced in Count I of STEEL INDUSTRIES, INC.'s complaint, a claim for breach of contract to deliver approximately 2.5 million pounds of steel, is **GRANTED.**

**SO ORDERED.**

any steel in the smaller sizes for the American grades 1030 fully annealed and 8620. (Paretskey Aff. ¶ 2). He further avers that. "[a]t the present time the [M] ill cannot produce the [aforementioned] grades and sizes of steel." (Paretskey Aff. ¶ 3). Interlink also has proffered deposition testimony of Valery S. Pyshkin, Head of the Foreign Relations Department at Mill. Pyshkin testified that in 1995, the Mill became unable to produce steel in accordance with Interlink's specifications (e.g. SII # 89030C–20703 and SII Quality Standards), because it no longer had the capability to use the "duplex open hearth method" of processing steel, a capability it allegedly had in 1994. (Pyshkin Dep. at 40).

IMG on the other hand, questions whether the Obukhovsky Mill is truly unable to produce its order. The first time Interlink asserted such a position, rather conveniently, was in response to the instant motion for summary judgment. Prior to that time, Interlink never informed IMG that the Mill was totally incapable of producing the steel. Rather, according to IMG, Interlink merely told IMG that the Mill could not produce the steel *at current prices.* For example, on March 4, 1995 Raykhelson wrote Townes a letter stating that production of all grades of steel "will resume as soon as the new prices are accepted." IMG poses the following question: if the Mill did *not* have the ability to produce various grades of steel in 1995, then why did the Mill include those grades in the price increase it demanded Interlink pass on to IMG.

24. It is uncontroverted that Interlink and the Mill mutually agreed to stop the production of the IMG's order after the Mill shipped 884,488 pounds of steel in 1996. (Raykhelson Aff. ¶ 20). Interlink failed to make any attempt to induce the Mill to continue producing the steel.

25. Making contacts with other Russian suppliers was not an additional effort Interlink made to fulfill the contract, but rather was business as usual for Interlink. At his deposition, Raykhelson explained that his job responsibility encompasses the continual pursuit of other sources. (Raykhelson Dep. at 187).